IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FREDERIQUE WOLF, an individual, | ) | 8:14CV46 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| CREIGHTON UNIVERSITY, a | ) | |
| Nebraska corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an employment case in which the plaintiff, Frederique Wolf ("Wolf"), claims she was discriminated against and harassed and because of her sex and age, and also retaliated against for complaining of the alleged discrimination and harassment.[1] Her employer, the defendant, Creighton University ("Creighton"), has moved for summary judgment on all claims. For the reasons discussed below, the motion for summary judgment will be granted and the case will be dismissed with prejudice.

### I. Factual Background

In accordance with the requirements of our local rules, Creighton has included a separate statement of material facts in its supporting brief. See NECivR 56.1(a). Because Creighton's statement is supported by the referenced affidavits, pleadings,

---

[1] The gender-based claims are brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, and the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. §§ 48-1101 to 48-1125. The age-based claims are brought under Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 to 634, and the Nebraska Age Discrimination in Employment Act ("NADEA"), Neb. Rev. Stat. §§ 48-1001 to 48-1010.

discovery responses, and deposition testimony, and is not controverted by Wolf, all facts stated are deemed admitted. *See* NECivR 56.1(b)(1). Those facts are:

1. Defendant Creighton University is a private, Catholic and Jesuit University engaged in providing undergraduate, graduate and professional higher-education services in Omaha, Nebraska. (Ex. B [Filing No. 29-2], Winters Aff., ¶ 2).

2. Creighton owns and operates The Cardiac Center of Creighton University (the "Cardiac Center"), which is engaged in cardiovascular research, clinical education, early detection and prevention of cardiovascular disease, and in pioneering the use of new cardiac procedures and therapies. (*Id.* at ¶ 4).

3. Cardiac Center employees assist with a variety of services, including procedures performed on patients in the catheterization (Cath) lab and the electrophysiology (EP) lab. (*Id.* at ¶ 6). Both labs are located within the Cardiac Center. (*Id.*).

4. Procedures performed in the Cath lab are invasive and involve the "plumbing" of the heart and include the implantation of stints and balloons. (Ex. C [Filing No. 30-1], Wolf Depo. 22:20-23:11). EP lab procedures are often less invasive, and address issues associated with the "electricity" of the heart including, ablations, or placement of a pacemaker or defibrillator in a patient to regulate a heartbeat. (*Id.*).

5. Plaintiff, Frederique Wolf, was hired as a Cardiovascular Technician (CVT) in the Cardiac Center's EP lab on November 5, 2009. (Ex. C, Wolf Depo. 32:10-22). Her direct supervisor was Jennifer McCashland, Nurse Manager. (Ex. B, Winters Aff., ¶ 18).

6. As a CVT in the EP lab, Wolf was responsible for operating certain lab equipment, preparing materials and equipment for various cardiac procedures and assisting cardiac physicians and nurses during cardiac procedures. (Ex. C, Wolf Depo. 21:14-22).

7. Throughout her tenure with Creighton, Wolf's performance was satisfactory. (Ex. B, Winters Aff., ¶ 24).

8. On April 3, 2012, Wolf submitted a written complaint to Dr. Tom Hee, Director of the Electrophysiology Laboratory regarding Dr. Kelley Airey, a female physician and assistant professor in the Cardiac Center. (*Id.* at ¶ 32).

9. Specifically, Wolf alleged that Dr. Airey was "hostile" to female employees working in the Cardiac Center, but not to male employees. (Ex. B(3) [Filing No. 29-2, at CM/ECF pp. 10-12], p. 4). She also alleged she felt discriminated against by Dr. Airey due to her age, based on Dr. Airey's apparent preference for "younger" staff members. (*Id.*).

10. Creighton promptly investigated Wolf's complaint. Beginning on April 5, 2012, Heidi Winters, Human Resources Manager and Connie Mimick, Administrative Director for the Cardiac Center, began an investigation into Wolf's allegations by interviewing several Cardiac Center employees, including Wolf. (Ex. B, Winters Aff., ¶¶ 33, 34).

11. At the conclusion of its investigation on April 17, 2012, Creighton determined that Wolf's claims of gender and age-related discrimination and harassment could not be substantiated. (Ex. B, Winters Aff., ¶ 35).

12. Creighton did, however, identify several issues related to communication and procedures within both Cardiac Center labs that needed to be addressed. (*Id.* at ¶ 36).

13. The Cardiac Center implemented a variety of changes and protocols following the investigation. (*Id.* at ¶ 36). These included: (a) purchasing and implementing a microphone for the Lab to provide clearer communications between physicians and staff during ablation procedures and eliminate the need to yell or speak in a raised voice; (b) establishing a clearer definitions of assigned duties by appointing a Daily Coordinator whose job it was to assign staff roles so it was clear which staff members were responsible for which tasks in lab each day to eliminate confusion; and (3) creating a break schedule to clarify appropriate parameters for employee meal breaks. (*Id.*).

-3-

14. In an effort to further address the communication issues identified during the course of Creighton's investigation, Dr. Airey was also required to attend a leadership/management training to assist in improving her leadership and communication skills with her staff. (*Id.* at ¶ 38).

15. Following the investigation, Winters and Mimick contacted Wolf to discuss their findings and recommended action plan. (*Id.* at ¶ 39). An email was also circulated to the Cardiac Center Lab staff to address and resolve the issues that had been identified by Wolf and other staff members during the investigation. (*Id.*) (Ex. B(4) [Filing 29-2, at CM/ECF p. 13]).

16. Wolf did not make any additional complaints to Creighton about Dr. Airey or the issues identified in her April 5, 2012 written complaint. (Ex. B, Winters Aff., ¶ 40).

17. As a CVT, in Creighton's Cardiac Center, Wolf was required to obtain Basic Life Support (BLS) and Advanced Cardiovascular Life Support (ACLS) certifications within 90 days of hire. (*Id.* at ¶ 9).

18. Creighton also required that CVTs who work in the Cardiac Center's EP and Cath labs obtain either the Registered Cardiovascular Invasive Specialist (RCIS) or the Registered Cardiology Electrophysiology Specialist (RCES) certification within two years of hire. (Ex. B, Winters Aff., ¶ 10) (Ex. C, Wolf Depo. 37:19-38:3). This requirement was communicated to all CVTs, including Wolf, upon hire. (Ex. B, Winters Aff., ¶ 10).

19. RCIS and RCES certification requirements are administered through Cardiovascular Credentialing International (CCI), an independent, third-party credentialing agency based in Raleigh, North Carolina. (Ex. B, Winters Aff., ¶ 12).

20. Qualification prerequisites are established by CCI for each certification: for RCIS certification, an applicant must have two years' experience working in a Cath Lab and submit an employment verification letter; for the RCES certification, an applicant must have two

-4-

years' experience in an EP Lab, and submit an employment verification letter. (*Id.* at ¶ 13).

21. Candidates for RCIS and RCES must comply with an application process established by CCI. (*Id.* at ¶ 14). A written two-page application is submitted to CCI for review and approval. (*Id.*). If the candidate meets the qualification prerequisites, and the application is approved, an Authorization to Test (ATT) is issued by CCI, which requires a candidate to complete with test within 90 days. (*Id.*). When the ATT is issued, candidates are provided with test center information, and are directed to arrange a date, time and location for taking the exam. (*Id.* at ¶ 15). The RCES/RCIS certification exams are scheduled at the convenience of each candidate. (*Id.*).

22. In 2012, Wolf worked full-time in Creighton's EP Lab and thus, was only eligible to take the RCES exam. (Ex. C, Wolf Depo. 170:8-18). She was not eligible to take the RCIS exam because she did not meet the eligibility criteria established by CCI. (*Id.*).

23. Wolf applied to take the RCES exam in February, 2012. (Ex. A(1) [Filing No. 29-1, at CM/ECF p. 3]).

24. Wolf took the RCES exam on May 21, 2012 and immediately received a computer-generated notice from CCI indicating that she had failed the exam. (Ex. A(2) [Filing No. 29-1, at CM/ECF p. 4]). She scored only 596 out of 900, although she needed a 650 to pass. (*Id.*).

25. Wolf first communicated the results of her test to her supervisor, Ms. McCashland on June 18, 2012. (Filing No. 2, Amended Compl. at ¶ 12(a)(ii)). CCI requires a 45-day waiting period to re-take the exam and certifications are valid for a period of 24 months. (Ex. B, Winters Aff., ¶ 16). Wolf never applied to re-take the exam. (Ex. C, Wolf Depo. 62:13-15). She was not denied the opportunity to retake the exam by anyone at Creighton and at no time was she terminated from her CVT position. (Ex. B, Winters Aff., ¶ 30).

26. Rather, on May 11, 2012, prior to sitting for her self-scheduled RCES exam, Wolf voluntarily applied for a Cardiac Technician II

position at the Cardiac Center. (*Id.* at ¶ 19). The position was posted online in Creighton's employment portal. (*Id.*). The Cardiac Technician II position did not require RCES or RCIS certification. (*Id.* at ¶ 20).

27. On June 19, 2012, the day after she first informed Ms. McCashland that she had failed the RCES exam, Wolf sent an email to Ms. McCashland, Heidi Winters, Human Resources Manager, and Dr. Tom Hee, Director of Creighton's Electrophysiology Laboratory resigning her position in the EP Lab and providing her supervisors with two weeks' notice of her resignation. (*Id.* at ¶ 20) (Ex. B(2) [Filing No. 29-2, at CM/ECF p. 9]).

28. Wolf began working in the Cardiac Technician II position with Creighton on July 9, 2012 in accordance with the schedule outlined in her resignation notice to the EP Lab. (Ex. B, Winters Aff., ¶ 22).

29. Wolf worked as a Cardiac Technician II until she became an employee of Alegent Creighton Health ("ACH") as of September 1, 2012, when Alegent Health and Creighton University executed an Asset Purchase Agreement and other corresponding contracts, which effectuated the created of ACH. Since September 1, 2012, Wolf has been an employee of ACH. (Ex. B, Winters Aff., ¶ 23).

(Filing No. 28, at CM/ECF pp. 1-6).

## II. Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, *Anderson*, 477 U.S. at 249.  However, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

"A mere scintilla of evidence is insufficient to defeat summary judgment and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (internal quotation marks and citations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## A. Title VII and NFEPA Claims

Title VII declares that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(1). Discrimination includes inappropriate conduct that creates a hostile work environment. *See* 29 C.F.R. § 1604.11(a)(3); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). It is also unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C.A. § 2000e-3(a).

NFEPA is patterned after Title VII, and Nebraska courts have looked to federal decisions in analyzing claims brought under the Nebraska Act. *See Leiting v. Goodyear Tire & Rubber Co.*, 117 F.Supp.2d 950, 955 (D.Neb. 2000); *Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999). Wolf's claims of gender discrimination, hostile work environment, and retaliation under Title VII and NFEPA therefore will be analyzed jointly, applying federal standards.

-7-

## 1. Gender Discrimination

"For [Wolf] to prevail on her gender-discrimination claim, she 'must show either direct evidence of discrimination or evidence that is sufficient to create an inference of discrimination under the *McDonnell Douglas*[2] burden shifting framework.'" *Fatemi v. White*, 775 F.3d 1022, 1040 (8th Cir. 2015) (quoting *Butler v. Crittenden Cnty.*, 708 F.3d 1044, 1050 (8th Cir. 2013)). Direct evidence is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Holmes v. Trinity Health*, 729 F.3d 817, 821 (8th Cir. 2013) (quoting *Torgerson*, 643 F.3d at 1044).

Because Wolf has presented no direct evidence of discrimination, she must prove gender discrimination under the *McDonnell Douglas* burden-shifting framework. *See Fatemi*, 775 F.3d at 1040. "To establish a prima facie case of sex discrimination, [Wolf] must prove that she: (1) belongs to a protected class; (2) possessed qualifications to perform her job; (3) suffered an adverse employment action; and (4) received different treatment than similarly situated employees who did not belong to the protected class." *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1130-31 (8th Cir. 2014). The parties only dispute the third and fourth elements, namely whether Wolf suffered an adverse employment action and whether she received different treatment because of her sex.[3]

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Rester*, 739 F.3d at 1131 (quoting

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[3] Although Creighton does not argue that Wolf is unable to prove the second element, the evidence shows that she did not have the required RCES certification.

*Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)). "Such action 'might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects' but '[m]inor changes' are not enough." *Id.* (quoting *Wilkie*, 638 F.3d at 955).

For purposes of proving a prima facie case of discrimination, a transfer or demotion can constitute an adverse employment action when it "results in a significant change in working conditions or a diminution in the transferred employee's title, salary, or benefits." *Fish v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000). However, where the demotion or transfer is voluntary on the part of the employee, it does not constitute an adverse employment action. *See Tusing v. Des Moines Ind. Comm. Sch. Dist.*, 639 F.3d 507, 521 (8th Cir. 2011) (teacher's voluntary transfer to lower-paying position at another school was not adverse employment action).

It is undisputed that Wolf resigned from her CVT position in the EP Lab (Ex. B(2)). It is likewise undisputed that Plaintiff's voluntary resignation from the CVT position was prompted by her failure to obtain the required RCES certification (Ex. C, Wolf Depo. 62:13-15). RCES certification is a legitimate and necessary job qualification for continued employment as a CVT in the EP lab (Ex. B, Winters Aff., ¶ 11). Wolf was solely responsible for failing the exam. (Ex. A(2)). At no time did she attempt to retake the exam (Ex. C, Wolf Depo. 62:13-15). Rather, she decided to transfer to the Cardiac Technician II position which she had applied for prior to even sitting for the certification exam (*Id.*). The evidence will not support a finding that Wolf suffered an adverse employment action, nor a finding that Wolf was treated differently from similarly situated male employees.

The certification requirement was not unique to Wolf, but was required of all CVTs. (Ex. B, Winters Aff., ¶ 10). This was a requirement Wolf was made aware of at the outset of her employment with Creighton (*Id.* at ¶ 30). Wolf does not identify any similarly situated employees who were permitted to remain in the CVT position following their failure of the certification exam. (*Id.* at ¶¶ 25-30). The evidence shows

that the only CVT in the Cardiac Center who did not possess either a RCIS or RCES certification was Wolf (*Id.* at ¶ 30). The other two CVT's, Steve Puffer and Daniel Vigen, both obtained their RCIS certifications in January of 2010. (*Id.* at ¶¶ 25-26).[4]

### 2. Hostile Work Environment

"To establish a prima facie case of hostile work environment, [Wolf] must show (1) membership in a protected group; (2) the occurrence of unwelcomed sexual harassment; (3) that the harassment occurred because of her sex; and (4) that the harassment affected a term, condition or privilege of her employment." *Rester*, 739 F.3d at 1131 (quoting *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 862 (8th Cir. 2009)). "This 'demanding' standard requires 'extreme' conduct 'rather than merely rude or unpleasant' conduct." *Id.* (quoting *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010)). The court must "look to the totality of the circumstances to consider whether the plaintiff has established 'that discriminatory intimidation, ridicule, and insult *permeated* the workplace.'" *Id.* (emphasis in original) (quoting *Cross*, 615 F.3d at 981).

Wolf cites several examples of how she contends Dr. Airey, a female physician in the EP Lab,[5] treated Wolf less favorably than her male counterparts, including:

---

[4] Two other male employees Wolf identifies as similarly situated are not CVTs and thus do not possess the RCIS or RCES certification. Steven Reid was not a CVT, but a Registered Nurse (Ex. B, Winters Aff., ¶ 28). Bradley Davis was a Radiology Technician and, consequently, held a different certification altogether (*Id.*).

[5] The Supreme Court has held that "nothing in Title VII necessarily bars a claim of discrimination ... merely because the plaintiff and the defendant ... are of the same sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998). "A trier of fact might reasonably find [gender] discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.*, at 80-81.

- Dr. Airey letting the "boys" eat breakfast, while the "girls" got the lab ready for the day;

- Dr. Airey yelling at Wolf for having an open water bottle in the EP Lab, while the "boys" were allowed to eat birthday cake in the same area;

- Dr. Airey repeatedly yelling at Wolf during patient procedures, and once yelling at Wolf for reminding Dr. Airey that she did not sign consent form;

- Dr. Airey calling Wolf to scream at her for failing to receive an email that Wolf alleges Dr. Airey never sent;

- Dr. Airey "bragging" about getting another female employee fired and openly making derogatory comments about a female employee's weight and her mistakes;

- Dr. Airey interrupting Wolf's report on a patient to scream at Wolf;

- Dr. Airey accusing Wolf of "sabotaging her reputation" when Wolf noted one of Dr. Airey's complaints in the patient chart and then refused to speak directly to Wolf about this incident;

- Dr. Airey screaming at Wolf during a procedure in front of staff; and

- Dr. Airey not reprimanding a male CVT who responded with hostility to a question Wolf asked about a patient procedure in Dr. Airey's presence.

(Ex. C, Wolf Depo. 127:6-168:1; Ex. D [Filing No. 30-2], pp. 8-9).

    "Hostile work environment claims must meet 'demanding' standards and courts are to 'filter out' those complaints concerning the "ordinary tribulations of the

workplace." *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519 (8th Cir. 2010) (quoting *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005)). Wolf "offers little more than speculation and conjecture" that Dr. Airey's treatment of her had anything to do with her gender. *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 567-68 (8th Cir.2000). Nor has she shown this behavior was objectively severe enough to give rise to a claim. *See Ottman v. City of Independence*, 341 F.3d 751, 760 (8th Cir. 2003) (district court erred in finding triable issue for jury where evidence only showed that city official had belittled the work of plaintiff and other females, but had not belittled the work of male employees; had belittled women's abilities; had cut off plaintiff's conversation with a city employee; had spoken condescendingly to plaintiff, as if she were a child; had, on two separate occasions, made the comment, "It's just like a woman" referring to two women, not plaintiff, who had disagreed with him; had occasionally referred to women as "girls"; had declared "we need more men"; and sometimes told female workers to "be quiet, men are talking"); *see also Helton v. Southland Racing Corp.*, 600 F.3d 954, 959-60 (8th Cir. 2010) (rude and demeaning conduct by supervisor insufficient); *Bradley v. Widnall*, 232 F.3d 626, 631-32 (8th Cir. 2000) (frustrating work situation insufficient), *abrogated on other grounds by Torgerson*, 643 F.3d at 1042-43, 1058. Wolf is unable to establish a prima facie case of hostile work environment because the alleged harassing conduct of Dr. Airey did not affect a term, condition or privilege of her employment, and because the evidence is not sufficient to prove that such conduct occurred because Wolf is a female.

### 3. Retaliation

"To establish a prima facie case of retaliation, [Wolf] must demonstrate that "1) she engaged in protected conduct; 2) a reasonable employee would have found her employer's retaliatory action materially adverse; and 3) the materially adverse action was causally linked to her protected conduct." *Rester*, 739 F.3d at 1131 (quoting *Wilkie*, 638 F.3d at 955). "Further, retaliation must be the 'but for' cause of the adverse employment action." *Jackman v. Fifth Judicial Dist. Dept. of Correctional*

*Services*, 728 F.3d 800, 804 (8th Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 2528 (2013)). "In the retaliation context, a materially adverse action is one that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Jackman*, 728 F.3d at 804-05 (quoting *Recio v. Creighton Univ.*, 521 F.3d 934, 940 (8th Cir. 2008)).

Creighton does not dispute that Wolf engaged in protected activity when we she filed an internal complaint against Dr. Airey on April 3, 2012. However, her prima facie case of retaliation fails because Wolf cannot establish she suffered any adverse employment action. As discussed above, Wolf voluntarily transferred to the Cardiac Technician II position after she failed the RCES certification exam. Wolf claims she was denied the opportunity to re-take the RCES exam in retaliation for filing the internal complaint against Dr. Airey (Ex. C, Wolf Depo. 165:1-166:19, 1754-11), but she never applied to retake the exam. Further, there is no evidence to suggest that Wolf's transfer to the Cardiac Technician II position, or the alleged denial of an opportunity to re-take the RCES exam, had any causal link to Wolf's complaints regarding Dr. Airey.

### B. ADEA and NADEA Claims

"Under the ADEA, employers are forbidden from taking adverse employment actions against employees because of their age." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) (citing *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876 (8th Cir. 2008)). The NADEA closely parallels and is interpreted in conformity with the ADEA. *Allen v. AT & T Technologies, Inc.*, 423 N.W.2d 424, 428 (Neb. 1988). Because the analysis of plaintiff's federal and state age discrimination claims is the same, they will not be separately discussed.

"[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *see also EEOC v.*

-13-

*City of Independence*, 471 F.3d 891, 894 (8th Cir. 2006) ("To succeed on a disparate treatment claim, the plaintiff must show the employee's age 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). Stated differently, "[t]o establish age discrimination, a plaintiff must prove by the preponderance of the evidence that age was the but-for cause of the employment decision." *Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2015). "The ADEA statute does not permit mixed-motives age discrimination claims." *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 801 (8th Cir. 2014). "This is not to say that age must have been the *only* factor in the employer's decisionmaking process, but only that, as among several factors, age was the factor that made a difference." *Id.* (emphasis in original).

## 1. Age Discrimination

"A plaintiff may establish [a] claim of intentional age discrimination through either direct evidence or indirect evidence." *King*, 553 F.3d at 1160. "By identifying direct evidence of discriminatory motive, a plaintiff overcomes summary judgment, foregoing the *McDonnell Douglas* analysis." *Hilde*, 777 F.3d at 1003. "But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, [s]he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Torgerson*, 643 F.3d at 1046).

Wolf, who is alleged to be 58 years old (Filing No. 2, ¶ 3), cites two instances she contends are circumstantial evidence of age discrimination. (Ex. D, pp. 8-9; Ex. C, Wolf Depo. 127:6-167:25). First, she alleges Dr. Airey "yelled" at her during ablation procedures because she perceived Wolf as hard of hearing due to her age. (Ex. D, pp. 8-9; Ex. C, Wolf Depo. 207:20-208:22). Second, she contends that Dr. Airey told her to "move faster" or insinuated she was "incompetent" in regard to certain aspects of operating room procedures, which Wolf also infers was because of

her age. (Ex. C, Wolf Depo. 159:7-160:25). These instances do not constitute direct evidence of age discrimination. *See Evance v. Trumann Health Services, LLC*, 719 F.3d 673, 677 (8th Cir.) (plaintiff's uncorroborated speculation that her religion and disability made her unpopular was not direct evidence of discriminatory animus), *cert. denied*, 134 S.Ct. 799 (2013). Wolf also maintains Dr. Airey stated she wanted "younger workers" in the EP Lab (Ex. C, Wolf Depo. 155:24-156:16; Ex. D, at p. 9). By Wolf's own admission, however, this was an isolated statement, allegedly made on December 10, 2011, which Wolf did not even hear (Ex. C, Wolf Depo. 155:24-156:16). Direct evidence of age discrimination does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself. *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152-53 (8th Cir. 2007).

To establish a prima facie case, Wolf "must show [she] (1) was at least forty years old, (2) suffered an adverse employment action, (3) was meeting [her] employer's legitimate expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger." *Gibson v. American Greetings Corp.*, 670 F.3d 844, 856 (8th Cir.) (quoting *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1039 (8th Cir. 2007)), *cert. denied*, 133 S.Ct. 313 (2012). Wolf's age discrimination claims fail as a matter of law because cannot prove the second and third elements of a prima facie case.[6] As already discussed in connection with the Wolf's Title VII and NFEPA claims, she did not suffer an adverse employment action and her failure to pass the RCES certification exam meant that she was unqualified for continued employment as a CVT in the EP lab.

---

[6] Creighton does not argue that the fourth element (*i.e.*, replacement by someone substantially younger) was not satisfied.

### *2. Hostile Work Environment*

"To prove a claim of hostile work environment, whether based on age or sex, [Wolf] must show "(1) [she] belongs to a protected group, (2) [she] was subjected to unwelcome harassment based on age [or] sex, (3) the harassment affected a term, condition, or privilege of [her] employment; (4) [her] employer knew or should have known of the harassment; and (5) the employer failed to take proper action." *Rickard v. Swedish Match North America, Inc.*, 773 F.3d 181, 184 (8th Cir. 2014) (quoting *Peterson v. Scott Cnty.*, 406 F.3d 515, 523-24 (8th Cir. 2005)), *petition for cert. filed*, 83 USLW 3841 (Apr. 16, 2015). Wolf cannot prove the second and third elements.

As with her gender-based hostile work environment claim, Wolf has failed to show that a term, condition, or privilege of her employer was affected by any alleged harassment. In addition, even if Wolf's age may have played a part in Dr. Airey's yelling at Wolf, telling her to move faster, and insinuating that she was incompetent, these alleged incidents are not severe enough to be actionable. "[T]he harassment must create "an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive." *Id.*, at 185 (quoting *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 540 (8th Cir. 2014)).

### *3. Retaliation*

Without direct evidence of a retaliatory motive, retaliation claims under the ADEA are analyzed using the burden-shifting framework of *McDonnell Douglas*. As with a Title VII retaliation claim, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: "(1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)). Again, Wolf has failed to show that she suffered an adverse employment action, or to show any causal link

-16-

between her complaint about Dr. Airy and her transfer to the Cardiac Technician II position, or the alleged denial of an opportunity to re-take the RCES exam.

### III. Conclusion

Wolf's claims of gender-based and age-based discrimination, hostile work environment, and retaliation all fail as a matter of law.

Accordingly,

IT IS ORDERED:

1. Defendant's motion for summary judgment (Filing No. 27) is granted, and Plaintiff's action is dismissed with prejudice.

2. Judgment shall be entered by separate document.

DATED this 12th day of June, 2015.

BY THE COURT:

s/ Richard G. Kopf
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

-17-